■ DONNA S. REDGRAVE, Appellant, v HARRY W. REDGRAVE, Respondent. [759 NYS2d 233] —Cardona, P.J. Appeals (1) from an order of the Supreme Court (Seibert, Jr., J.), entered September 3, 2002 in Saratoga County, which granted defendant's motion to dismiss the complaint, and (2) from an order of said court, entered September 3, 2002 in Saratoga County, which granted defendant's motion for counsel fees and expert witness fees.

The parties were married in May 1972 and have three

children. In May 2001, plaintiff commenced this action for divorce alleging cruel and inhuman treatment and adultery (*see* Domestic Relations Law § 170 [1], [4]). At the conclusion of a nonjury trial, Supreme Court granted defendant's motion to dismiss the complaint. Thereafter, Supreme Court granted defendant's application for counsel and expert fees directing plaintiff to pay $8,198.25 and $5,981.25, respectively.

Initially, we disagree with plaintiff's contention that the proof was sufficient to grant a judgment of divorce based upon adultery. Her testimony that defendant returned to live at the marital home at her invitation subsequent to the revelation of his infidelity evidenced the parties' "voluntary cohabitation * * * with the knowledge of the fact," conclusively establishing the affirmative defense of forgiveness (Domestic Relations Law § 171 [2]).

Next, plaintiff argues that the evidence submitted was adequate to support her claim that defendant was guilty of cruel and inhuman treatment. To prevail on that ground, "the party seeking the divorce must establish that the other party's conduct so threatened his or her physical or mental well-being that it would be unsafe or improper to continue to cohabit with the offending party" (*Shortis v Shortis*, 274 AD2d 880, 880-881 [2000]). Moreover, while a high degree of proof of cruel and inhuman treatment is required in the context of a long duration marriage (*see Brady v Brady*, 64 NY2d 339, 344 [1985]; *Newkirk v Newkirk*, 212 AD2d 951, 951-952), such a marriage will not bar the granting of a divorce upon that ground (*see Brady v Brady, supra* at 345; *Collins v Collins*, 284 AD2d 743, 745 [2001]).

We turn to an examination of the salient trial evidence. Plaintiff testified that in 1995, at a motel in Rhode Island, defendant swore at her, called her names, threw a pitcher of water on her and pushed her out of bed. She further recounted two occasions in 1997 when she intervened in physical altercations between defendant and the parties' sons. During the incidents, defendant pushed plaintiff backwards causing her to fall. After one such occurrence, she sustained a bruise to her back. Adding to plaintiff's emotional upset, during that same incident she witnessed defendant pushing the child into a wall with such force that his head caused an indentation. Plaintiff testified that on June 15, 1997, defendant became angry and swung at her with his fist. Plaintiff dropped to the floor to avoid being struck and then ran upstairs. There, she cowered in a corner and covered her head with her arms. Defendant struck her additional times bruising her arms. She begged him

to stop and tried to get to the phone to call 911, but defendant pulled the cord out of the wall. The incident ended when plaintiff ran downstairs and sought protection from one of her sons.

Plaintiff's sister, Deborah Schaftlein, who stayed at the parties' home each summer, testified that during the summers of 1997 through 2000, defendant drank alcohol continually throughout most days to the point of intoxication. Defendant was not employed at those times. When plaintiff arrived home from work, Schaftlein observed that defendant would insist on talking with plaintiff exclusively, demanding her full attention by screaming at her to join him upstairs or on the porch, away from Schaftlein and the children. If anyone tried to talk to plaintiff at such times, defendant became upset and would verbally abuse plaintiff. Schaftlein further testified that when drunk, defendant would be verbally abusive to the children and often struck their son David.

During the summer of 2000, at a party attended by neighbors, friends and coworkers, defendant became intoxicated. At the end of the evening, he embarrassed plaintiff by stumbling into a wall and falling down. Later that evening, after first locking plaintiff out of the marital bedroom, he demanded that she return rather than spend the night in another room. Once inside their bedroom, however, defendant would not let plaintiff go to sleep. He yelled at her continually only stopping when plaintiff's sister threatened to call the police. On another occasion, with relatives in the home, he locked her out of their bedroom and she testified, "I went downstairs and slept on the floor behind the couch so no one would see what my husband had done."

On January 24, 2000, defendant's paramour called plaintiff to tell her of defendant's infidelity, including the fact that it had occurred at the marital residence. Plaintiff was "shocked, floored." When confronted, defendant did not deny his infidelity. Immediately thereafter, defendant left the marital residence at plaintiff's request for the next six months. To induce reconciliation, defendant promised, among other things, that he would no longer drink, however, he resumed drinking two weeks after his return.

Plaintiff testified generally that if she did not agree to defendant's demands, he would get angry and verbally harass her. In the event that she attempted to leave his presence, he would follow her around blaming her for ruining the marriage. On occasion, after locking the door of the parties' bedroom to get away from him, he would bang on the door threatening to

break it down. She also indicated that if she tried to be "some place [in the house] where he did not want her to be," he would physically "pick [her] up and remove[ ] [her] from where [she] was and put her where he wanted [her] to be." She further testified that "any little thing that upset defendant would cause him to drink more and then the more he drank the more volatile he became" and that she "was afraid of him her entire life." Plaintiff stated that if she did not comply with his demands, he would "just get worse, get more physical and more abusive emotionally." She testified that she always felt completely defeated and demoralized. In March 2001, she began sleeping in the guest room, locking the door in order to feel safe. She finally left the marital residence permanently in June 2001 after defendant refused to leave.

Apart from his insistence that he never intended to hit plaintiff, defendant's testimony was equivocal and punctuated by memory lapses. Nevertheless, it generally confirmed plaintiff's allegations. Defendant admitted throwing water on plaintiff in the motel room in Rhode Island, but did not recall pushing her off the bed. He acknowledged many arguments over the years, but could not recall the times when alcohol was involved. He stated that he may have pushed plaintiff away inadvertently during the altercations with his sons, but admitted that he pushed Michael's head into the wall causing an indentation. He confirmed locking her out of the bedroom, breaking his promise to her at the time of their reconciliation by resuming his consumption of alcohol and following her from room to room after arguments so she would have to talk to him. He admitted that plaintiff told him that she was afraid of him, but he attributed that fear to intimidation resulting from his loud manner of speaking. As far as the June 15, 1997 incident, he remembered a "screaming match," but did not remember deliberately swinging at her, although he may have done so inadvertently. He admitted that he had been drinking at the time, but did not know if he was intoxicated. Defendant remembered plaintiff picking up the phone receiver that night to dial 911, taking it from her and hanging it up, but did not recall ripping it from the wall. He also could not remember if he told plaintiff that evening, as he had apparently done in the past, that it would not do her any good to call the police because he was a retired police officer.

We are cognizant of the long duration of this marriage, and of the deference generally accorded to Supreme Court's factual determinations (*see Shortis v Shortis*, 274 AD2d 880, 881 [2000], *supra*; *Gray v Gray*, 245 AD2d 584, 585 [1997]) and

credibility assessments (see *Shortis v Shortis, supra* at 881; *Newkirk v Newkirk*, 212 AD2d 951, 952 [1995], *supra*) as trier of the facts. Nevertheless, under the totality of the circumstances herein and the cumulative effect of defendant's conduct upon plaintiff, we find that plaintiff established, by a preponderance of the credible evidence, that defendant's recurring episodes of anger and volatile conduct, precipitated by his excessive consumption of alcohol, his other conduct as noted above, presents a clear threat to plaintiff's physical and emotional well-being, rendering it unsafe for her to continue to cohabit with him (see Domestic Relations Law § 170 [2]). Accordingly, we reverse Supreme Court's order dismissing the complaint and direct that plaintiff be granted a judgment of divorce against defendant upon the ground of cruel and inhuman treatment.

Next, we address plaintiff's contentions that Supreme Court erred in directing her to pay defendant's counsel fees and expert fees for the appraisal of her interest in a title company. Plaintiff first argues that Supreme Court lacked the jurisdiction to award the fees because the action was terminated by dismissal of the complaint prior to defendant's fee application. We find no merit to that argument. In a divorce action, the court is authorized to direct a party to pay the counsel fees and expenses* of the other spouse provided that direction is "made prior to final judgment" (Domestic Relations Law § 237 [a]). That language has been interpreted to permit the court to direct payment of fees and expenses "at any time after the start of the action up through the *entry* of final judgment" (*O'Shea v O'Shea*, 93 NY2d 187, 192 [1999] [emphasis added]; see *Pratt v Pratt*, 282 AD2d 941, 943-944 [2001]). Here, defendant made his application eight days after the oral dismissal of the complaint, which was several months prior to the entry of the final order dismissing the action. Under such circumstances, Supreme Court was authorized to entertain the application.

We do, however, agree with plaintiff's argument that it was error for Supreme Court to award counsel and expert fees without a hearing in the absence of a stipulation consenting to a determination upon written submissions, despite her failure to request a hearing (see *Carlson-Subik v Subik*, 257 AD2d 859, 862 [1999]; see also *Matter of Flynn v Rockwell*, 295 AD2d

---

* The term "expenses" includes, among other things, accountant fees and other fees, if determined by the court "to be necessary to enable a spouse to carry on or defend an action" (Domestic Relations Law § 237 [d]; see *Lawson v Lawson*, 288 AD2d 795, 800 [2001]).

672, 675 [2002]; *Ott v Ott*, 266 AD2d 842 [1999]; *Stricos v Stricos*, 263 AD2d 659 [1999]; *Sim v Sim*, 248 AD2d 781, 781-782 [1998]). To the extent that other decisions of this Court have held to the contrary (*see O'Connell v O'Connell*, 290 AD2d 774 [2002], *lv granted* 99 NY2d 503 [2002]; *Hapeman v Hapeman*, 229 AD2d 807 [1996]; *Gundlach v Gundlach*, 223 AD2d 942 [1996]), they should no longer be followed.

We have considered plaintiff's remaining contentions and find that they are either academic or lack merit.

Peters, Spain, Carpinello and Lahtinen, JJ., concur. Ordered that the orders are reversed, on the law, without costs, motions denied, plaintiff is granted a divorce on the ground of cruel and inhuman treatment and matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision.